# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC TODD GRIMM, <br>       Plaintiff, <br><br> v. <br><br> CAROLYN W. COLVIN, <br> ACTING COMMISSIONER <br> OF SOCIAL SECURITY, <br>       Defendant. | 1:14-CV-1614-TFM |

## MEMORANDUM OPINION

September 1, 2015

## I.  Introduction

Eric Todd Grimm ("Plaintiff") brought this action for judicial review of the decision of the Acting Commissioner of Social Security, which denied his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403, 1381-1383. The parties have filed cross-motions for summary judgment, ECF Nos. 8, 13, which have been fully briefed, ECF Nos. 9, 14, and are ripe for disposition. For the reasons that follow, the Acting Commissioner's motion will be **GRANTED**, and Plaintiff's motion will be **DENIED**.

## II.  Background

Plaintiff was born on June 25, 1970. (R. 35). He alleges disability as of September 25, 2010, due to Type II diabetes, kidney stones, migraine headaches, high blood pressure, and a thoracic spine injury. (R. 194). He has past relevant work experience as an embroidery operator, but he has not engaged in substantial gainful activity since his alleged onset date. (R. 19, 35). Plaintiff's coverage for SSI expired on December 31, 2011. (R. 19). He previously filed applications for DIB and SSI on November 13, 2008, alleging disability as of January 1, 2009.

1

These applications were denied in a decision dated September 24, 2010. (R. 76-90).

### A. Medical Evidence

#### 1. Migraine Headaches

In 2008, Plaintiff's primary care physician, Mary Beth Krafty, M.D., referred him to a neurologist, Louis W. Catalano, Jr., M.D., for his headaches and right shoulder pain.[1] Following his initial consultation with Plaintiff, Dr. Catalano noted that he complained of "persistent pain in the left flank and lower thoracic area," as well as headaches, accompanied by nausea, photosensitivy and sonosensitivity, one or two times per week. (R. 244). Dr. Catalano started Plaintiff on Replax and Depakote for his headaches and ordered an MRI, the results of which showed mild cerebral atrophy but were otherwise normal. (R. 246-47). An electroencephalogram completed the next month was also normal. (R. 242). Over the course of the next two years, Plaintiff saw Dr. Catalano approximately every four months for prescription management – he was prescribed, at various points, Depatoke, Fiorcet, and Imitrex – and trigger point / nerve block injections for his neck and shoulder pain. (R. 248-56). By July 27, 2010, Plaintiff reported that he was "feeling pretty good." (R. 256). His headaches were controlled, and his neck pain was "quiet." (R. 256). Still, he continued to have one to two headaches a week, in addition to right shoulder pain. (R. 256).

Plaintiff returned to Dr. Catalano's office on August 24, 2011, after a 14-month hiatus in his treatment. At that point, Plaintiff reported that he "fe[lt] all right." (R. 257). His "[s]houlder pain [was] about the same," and he reported having migraines every other day. (R. 257). He also reported that Depakote "helped some with migraines," by decreasing their "frequency and

---

1. There is a medical source statement in the record that was sent by the state agency to Dr. Catalano in January 2012 but never completed. (R. 262-63). Be that as it may, "[t]he lack of a MSS specifically does not render a medical report incomplete." *Moser v. Barnhart*, 89 F. App'x 347, 348 (3d Cir. 2004).

intensity." (R. 257). He also said that Imitrex had been working. (R. 257). However, he had apparently run out of medication two months before his appointment but never called for a refill. (R. 257).

Plaintiff next saw Dr. Catalano seven months later, at which time he complained of experiencing "six headaches per week, lasting from hours to days." (R. 356). Plaintiff reported that Imitrex decreased his symptoms but did not eliminate his headaches entirely. (R. 356). Dr. Catalano recorded normal physical and mental examination findings and diagnosed Plaintiff with bilateral occipital neuralgia, bilateral cervicalgia with dystonia, bilateral shoulder pain, migraines – common, and diabetes. (R. 356). Furthermore, he adjusted Plaintiff's medication, starting him on Topamax and decreasing his dosage of Depakote. (R. 356).

At his next appointment in May 2012, Plaintiff said that his headaches were about the same as they were during his last visit. (R. 357). He reportedly had them "every day with variable severity and at times," he said, they rendered him "bedridden." (R. 357). He said that Topamax provided him no relief. (R. 357). Dr. Catalano's findings, however, were again normal. (R. 357). Dr. Catalano adjusted Plaintiff's medications again, increasing his dosage of Topomax and Depakote. (R. 357).

In August 2012, Plaintiff reported that he was "still getting daily headaches, but with [the] change in medications, the severity ha[d] decreased." (R. 357). Plaintiff further explained that he had sensitivity to light and sound, nausea, and vomiting. (R. 358). Imitrex was the only medication that helped, but Plaintiff only received a nine-month dosage because of his insurance. (R. 358). Dr. Catalano again recorded normal examination findings.

Plaintiff underwent a brain MRI on March 7, 2013, which revealed mild cortical atrophy, but there was no evidence of a mass lesion or acute infraction. (R. 386). Plaintiff's paranasal

sinuses also showed subtle chronic inflammatory changes. (R. 386).

The next month, Plaintiff returned to Dr. Catalano's office for a follow-up.[2] (R. 387). He reported having a headache every other day. (R. 387). His medications were helpful, but he said that they "knock[ed] him out." He also complained of "severe" nausea and vomiting and trouble sleeping. (R. 387). A physical examination was normal. (R. 387). Dr. Catalano diagnosed Plaintiff with "1) Chronic progressive headache, transformed migraine. 2) Chronic daily headache. 3) Neck pain with bilateral occipital neuralgia. 4) Diabetes mellitus, type 2. 5) Neuropathy. 6) Sleep disorder." (R. 387). Dr. Catalano prescribed a trial of Cymbalta and continued Plaintiff on his other medications. (R. 387).

### 2. Musculoskeletal Impairments

Plaintiff was referred to a pain management specialist, John Park, M.D., on September 27, 2010 (just two days after his alleged onset date), for his degenerative disc disease.[3] (R. 321). Plaintiff complained of right-sided mid-back pain, which he rated 4 out of 10. (R. 321). Upon examination, Plaintiff's gait was normal, and he could perform "heel walk and tip toe walk with difficulty." (R. 321). However, he displayed some tenderness in his mid-back, parathoracic muscle region. (R. 321). In terms of the range of motion of Plaintiff's back, he displayed 70 degrees of forward flexion, 30 degrees of backward flexion, and 40 degrees of sideways flexion. (R. 321). Otherwise, his range of motion was full. (R. 321). Neurologically speaking, Plaintiff

---

2. Dr. Catalano's notes from his April 8, 2013, appointment with Plaintiff indicate that Plaintiff last seen "on February 21, 2013 regarding headache." (R. 387). However, there are no treatment notes from the February 21, 2013, visit – or any other visit between August 2012 and April 2013 – in the administrative record.

3. Plaintiff underwent a total body bone scan in July 2008, which showed a "faint increased tracer uptake . . . involving the proximal one third of the right humeral shaft" and in "the lower thoracic spine which correspond[ed] to mild hypertrophic degenerative change seen on [a] recent lateral chest film." (R. 271).

was also normal. (R. 321). Nevertheless, Dr. Park prescribed Plaintiff with Percocet, Fioricet, and Soma. (R. 321).

Plaintiff had a follow-up with Dr. Park on October 25, 2010, complaining of pain below his right shoulder. (R. 323). His condition was largely unchanged from the prior month, though he rated his pain 10 out of 10. (R. 323). He also reported tenderness at the neck and shoulder, paracervical, trapezius, and infraspinatus muscle region, in addition to the mid-back region. (R. 323). His neurological exam was still normal, however. (R. 323).

Plaintiff's condition remained largely the same through the remainder of 2010 and into early 2011. (R. 325). In June 2011, Plaintiff underwent his first trigger point injection (to the trigger points of the neck and shoulders), which successfully decreased his pain level and helped with his ability to perform daily activities. (R. 335).

Plaintiff went to the emergency room at Uniontown Hospital complaining of back pain on November 6, 2011. His physical examination was largely normal, and he was discharged the same day. (R. 278-80).

Plaintiff continued to see Dr. Park on a regular basis over the course of the next year, receiving trigger point injections to his shoulder about once a month until August 2012. (R. 338-50, 359-69). He also twice underwent a selective nerve root block injection to his spine, first in August 2011 and again in August 2012.[4] (R. 340, 369). A cervical spine MRI was performed at the behest of Dr. Catalano on March 7, 2013, which showed small disc protrusions at C3-4 and C5-6, but no evidence of cord signal change or abnormal cord enhancement or significant central canal or foraminal stenosis at any level.

---

4. In addition to his treatment with Dr. Parks at the pain management clinic, Dr. Krafty's notes indicate that Plaintiff was seeing a chiropractor in 2011. (R. 267).

### 3. Other Medical Evidence

Plaintiff has treated with his PCP, Dr. Krafty, since 2003, for a variety of conditions, including diabetes, hypertension, and kidney stones. His diabetes was controlled by Metformin. (R. 371-82). His hypertension was considered benign and low risk. (R. 371). He apparently suffered two bouts of kidney stones during the relevant time period. But since the stones were small, Dr. Krafty decided to simply continue to observe them. (R. 377).

On May 8, 2013, Dr. Krafty completed interrogatories at the request of Plaintiff's counsel. (R. 388). She indicated that she had diagnosed Plaintiff with fibromyalgia – chronic back pain, kidney stones, chronic pain, migraine headaches, high blood pressure, and diabetes. (R. 388). She concluded that Plaintiff's conditions would cause him to experience pain and fatigue and that the side effects from Plaintiff's medications and his poor concentration caused by his medications and pain would also affect his ability to work. (R. 388). In particular, she found that Plaintiff would not be able to maintain concentration or work pace for 90% of a work day. (R. 389). When asked to explain the basis for this answer, Dr. Krafty wrote, somewhat curiously, "[H]e cannot do manual labor [because of his] back pain – twisting, repetitive activities [and] lifting for 8 [hours] would be problematic." (R. 389). Ultimately, Dr. Krafty concluded that Plaintiff would not be capable of performing any work at any exertion level, reasoning that "even a sedentary job would be problematic as [Plaintiff] requires frequent changes of position and rest periods." (R. 390). She also opined that Plaintiff would be absent from work more than four days per month due to his impairments. (R. 390).

### B. Procedural History

Plaintiff filed his applications for DIB and SSI on November 22, 2011. His claims were denied at the state-agency level, and thereafter, he requested a hearing, which was held on May

9, 2013, before Administrative Law Judge ("ALJ") Jeffrey P. La Vicka in Morgantown, West Virginia. Plaintiff was represented by counsel and testified at the hearing, as did an impartial vocational expert ("VE").

On May 28, 2013, the ALJ issued a decision, in which he denied Plaintiff's claim for benefits, after having found that he could perform unskilled, sedentary work with a range of non-exertional and environmental restrictions. In reaching that decision, the ALJ largely adopted the residual functioning capacity ("RFC") assessment crafted by the ALJ who denied Plaintiff's claims in September 2010. (R. 20) (according "substantial weight to this prior determination as it represents [Plaintiff's] baseline status at the beginning of the period at issue in the current application"). "However," the ALJ explained, "to accord [Plaintiff] the utmost benefit of the doubt, the undersigned has added additional limitations." (R. 20). The ALJ's decision became final when the Appeals Council denied Plaintiff's request for review on September 25, 2014. This action followed.

### III. Legal Analysis

#### A. Standard of Review

The Act strictly limits the Court's ability to review the Commissioner's final decision. 42 U.S.C. § 405(g). "This Court neither undertakes a de novo review of the decision, nor does it re-weigh the evidence in the record." *Thomas v. Massanari*, 28 F. App'x 146, 147 (3d Cir. 2002). Instead, the Court's "review of the Commissioner's final decision is limited to determining whether that decision is supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). If the Commissioner's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C. § 405(g). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971). It consists of more than a scintilla but less than a preponderance of the evidence. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010). Importantly, "[t]he presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 764 (3d Cir. 2009).

B. Discussion

Plaintiff raises five arguments in support of his motion for summary judgment. The first two are based on alleged violations of the Hearings, Appeals and Litigation Law Manual ("HALLEX"). First, he argues that the ALJ violated HALLEX I-2-6-58(c) by failing to ask him or his attorney whether they objected to any of the exhibits admitted at the hearing. Second, he argues that the ALJ violated HALLEX I-2-6-74(b) by failing to ask him or his counsel whether they accepted the VE's qualifications. Plaintiff's remaining three arguments relate to the ALJ's consideration of the interrogatory answers submitted by Dr. Krafty, the ALJ's assessment of Plaintiff's credibility, and the hypothetical question posed to the VE. These arguments will be addressed *seriatim*, with the two HALLEX-based arguments addressed together at the outset.

1. HALLEX Violations

Plaintiff's HALLEX-based arguments can be resolved quickly. Social Security hearings must adhere to certain minimum standards of due process. *See Bordes v. Comm'r for Soc. Sec.*, 235 F. App'x 853, 857 (3d Cir. 2007) (not-precedential) (quoting *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995)). However, "the HALLEX is an internal guidance tool" with "no legal force" and, as such, "it is not judicially enforceable or binding" on the Social Security Administration. *Hitchcock v. Comm'r of Soc. Sec. Admin.*, No. CIV.A. 09-551, 2009 WL

8

5178806, at *10 (W.D. Pa. Dec. 21, 2009) (citing *Edelman v. Comm'r for Soc. Sec.*, 83 F.3d 68, 71 n.2 (3d Cir. 1996); *Bordes*, 235 F. App'x at 859). Thus, Plaintiff cannot establish that he suffered a deprivation of due process simply by pointing to alleged violations of the HALLEX. *See Bordes*, 235 F. App'x at 859. Now, the Third Circuit Court of Appeals has recognized that "[t]he Fifth Circuit has taken a more stringent approach," finding that a violation of the HALLEX can be cause for remand if the claimant suffered prejudice as a result. *Id.* (citing *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000)). Even under the Fifth Circuit's approach, however, Plaintiff's argument must fail because he has not alleged how he was prejudiced by the ALJ's alleged violations of the HALLEX.

### 2. Treating Physician Rule

Plaintiff next maintains that the ALJ should have accorded greater weight to the opinions of his PCP, Dr. Krafty. Under the treating physician rule, a treating physician's opinion is generally entitled to greater weight than that of any other acceptable medical source. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)). Indeed, a treating physician's opinion must be given "controlling weight" when it is founded upon "medically acceptable, clinical, and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] record[.]" 20 C.F.R. § 404.1527 (c)(2). When a treating physician's opinion is not deemed controlling, the amount of weight to which it is entitled still must be assessed in accordance with "the factors provided in 20 CFR 404.1527 and 416.927." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* While an ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting

9

explanations are provided," *Plummer*, 186 F.3d at 429, he can to reject "a treating physician's opinion outright only on the basis of contradictory medical evidence," *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). On the other hand, "an ALJ may not make speculative inferences from medical reports" or reject a treating physician's opinion on the basis of his "own credibility judgments, speculation or lay opinion." *Id.*

As a corollary of this rule, an ALJ must always set forth "good reasons . . . for the weight" given to a "treating source's opinion" in his decision. 20 C.F.R. § 404.1527(c)(2). The reasons must be "supported by the evidence in the case record, and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5. This requirement is not meant to be onerous. "[I]n most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Nevertheless, "[t]he Third Circuit has instructed that remand is appropriate where such an adequate explanation is not present." *Ray v. Colvin*, No. 1:13-CV-0073, 2014 WL 1371585, at *18 (M.D. Pa. Apr. 8, 2014) (citing *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001)).

In this case, the ALJ gave "good reasons" for discrediting some of Dr. Krafty's opinions. The ALJ adopted Dr. Krafty's opinion that Plaintiff "cannot do manual labor such as twisting, repetitive activities or lifting for eight hours." (R. 24). However, the ALJ gave Dr. Krafty's other opinions "less weight," finding them "to be baseless and unsupported by the medical evidence of record." This explanation is sufficient. First, Dr. Krafty's opinions were indeed without a credible basis. She acknowledged as much in her report, as she did not describe any clinical findings or diagnostic techniques that supported her conclusions. Second, her opinions were

actually "unsupported by the medical evidence of record." As recounted by the ALJ, Plaintiff's physical and mental examinations were routinely unremarkable, as were the results of MRIs and other diagnostic tests. Not even Dr. Krafty's own treatment notes reflected impairments as severe as those described in her interrogatory answers.

Plaintiff argues that since the ALJ did not actually cite the evidence that contradicts Dr. Krafty's opinions immediately after stating that he was giving these opinions less weight, neither the Acting Commissioner nor the Court can fill in the gaps in the ALJ's reasoning. It is true "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 (1943). But the Court need not "read the ALJ's opinion in a vacuum." *Knox v. Astrue*, No. Civ.A.09–1075, 2010 WL 1212561, at *7 (W.D. Pa. May 26, 2010). "The standard of review still requires that the reviewing court examine the record as a whole to determine whether the ALJ's reasoning is supported by substantial evidence." *Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012). Thus, although the ALJ did not explicitly set forth the evidence that contradicted Dr. Krafty's opinions immediately after stating that he was giving these opinions less weight, it is clear from his decision, as a whole, what evidence – or, actually, lack of evidence – he was referring to. Simply put, there was nothing in the administrative record that supported Dr. Krafty's conclusions. And, in any event, the ALJ afforded Plaintiff the utmost benefit of the doubt by limiting him to unskilled, sedentary work with a sit-stand option and a long list of other restrictions, which was largely consistent with Dr. Krafty's assessment (save for her extreme finding that Plaintiff would miss more than four days of work per month). Accordingly, the

matter need not be remanded for further consideration of Dr. Krafty's opinions.[5]

   3.     **Credibility Finding**

Plaintiff's next argument is, in essence, an attack on the ALJ's adverse credibility finding. He argues that the ALJ erred in discrediting him because, as the ALJ put it, "[he] has not generally received the type of medical treatment one would expect from a totally disabled individual." (R. 23). "Simply put," Plaintiff contends, "there is no particular treatment, or set of treatments, that a 'totally disabled individual' does or should be expected to receive. If there were, it would be for a qualified physician to decide, not an Administrative Law Judge." Pl.'s Br. at 15, ECF No. 14.

No one disputes that "an 'ALJ may rely on lack of treatment, or the conservative nature of treatment, to make an adverse credibility finding[.]'" *Altman v. Colvin*, No. 13-994, 2014 WL 4792444, at *2 (W.D. Pa. Sept. 23, 2014) (quoting *Wilson v. Colvin*, No. 3:13-cv-01401-GBC, 2014 WL 4105288, at *11 (M.D. Pa. Aug. 19, 2014)). But still, "[t]he Court agrees with [Plaintiff] that, by not citing, or even alluding to, any expert medical evidence or opinion that non-routine or more aggressive treatments (e.g., back surgeries, hospitalizations, or emergency-room visits) would have been prescribed, recommended, or expected if [Plaintiff's] impairments and/or symptoms were as severe as he alleged, the ALJ was expressing a medical opinion for which he was not qualified." *McGuigan v. Colvin*, No. 1:13-CV-1539-DKL-JMS, 2015 WL 846415, at *5 (S.D. Ind. Feb. 25, 2015).

Be that as it may, the ALJ's error was harmless because he provided other legitimate reasons for discounting Plaintiff's credibility – specifically, his limited work history and his self-

---

5.     The Court also notes that Dr. Krafty's answer to the eighth interrogatory, which asked whether Plaintiff could perform any work, at any exertion level, touched on an issue "reserved to the Commissioner." SSR 96-5p, 1996 WL 374183, at *5. As a result, it was not "entitled to controlling weight" or required to be "given special significance." *Id.*

reported activities of daily living. *See generally* SSR 96-7p, 1996 WL 374186 (July 2, 1996) (discussing factors the ALJ must consider in assessing a claimant's credibility). In addition, Plaintiff has failed to explain how the ALJ's generous RFC assessment failed to sufficiently account for his allegations regarding the severity of his impairments. Indeed, although the ALJ said that he did not find Plaintiff to be entirely credible, he nevertheless mostly credited his allegations regarding the severity of his impairments. (R. 23). The ALJ found, however, that despite those credible allegations, Plaintiff could still perform unskilled, sedentary work, with a number of additional restrictions. This decision is supported by substantial evidence.

### 4. Hypothetical Question

Plaintiff's final argument is that the ALJ erred by failing to incorporate his alleged sensitivity to light into the hypothetical question posed to the vocational expert. "[O]bjections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005). Such is the case here. What Plaintiff is really arguing is that the vocational expert's "testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations" stemming from his alleged photosensitivity "during the RFC assessment and so did not convey those limitations to the vocational expert." *Id.*

Although Plaintiff is correct that the ALJ did not discuss Plaintiff's alleged sensitivity to light when formulating his RFC, the Court finds that this is not cause for remand. First, as the ALJ reasonably concluded, Plaintiff's headaches are, for the most part, well controlled when he is compliant with his medications. When his headaches are under control, it follows that he does not experience sensitivity to light. Thus, although the ALJ may not have specifically discussed Plaintiff's alleged sensitivity to light, he provided legally sufficient reasons for finding that the

symptoms of his headaches, on the whole – which would include light sensitivity – are not as severe as alleged and would not totally preclude him from working. Second, there are only three essentially fleeting references to light sensitivity in the record: the first is in the "subjective findings" section of a treatment note from Dr. Catalano dated September 18, 2008; the second is in the "history" section of an August 27, 2012, note from Dr. Catalano; and the third is in the headache chart completed by Plaintiff at the behest of Dr. Catalano. (R. 244, 358, 235-40). None of these records reflected any discussion whatsoever of how Plaintiff's alleged sensitivity to light would affect his ability to work. Likewise, neither Plaintiff nor his attorney ever mentioned Plaintiff's alleged sensitivity to light during the administrative hearing, let alone described how this symptom would lead to a more restrictive RFC assessment than that which the ALJ found or affect Plaintiff's ability to perform the two jobs that the VE identified. Nor did Dr. Krafty mention light sensitivity as a reason as to why Plaintiff would be precluded from working. Accordingly, insofar as the ALJ may have erred in failing to specifically discuss Plaintiff's alleged sensitivity to light, the error was harmless, for the same RFC assessment would result on remand.

## IV. Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges that he faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Act.

For the reasons hereinabove stated, the Court will **GRANT** the Motion for Summary Judgment filed by the Acting Commissioner and **DENY** the Motion for Summary Judgment filed

by Plaintiff. An appropriate Order follows.

McVerry, S.J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC TODD GRIMM,<br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>ACTING COMMISSIONER<br>OF SOCIAL SECURITY,<br>　　　　Defendant. | )<br>)<br>)<br>)  1:14-CV-1614-TFM<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

**AND NOW**, this 1st day of September 2015, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the Acting Commissioner's MOTION FOR SUMMARY JUDGMENT (ECF No. 8) is **GRANTED**, and Plaintiff's MOTION FOR SUMMARY JUDGMENT (ECF No. 13) is **DENIED**.

The Clerk shall docket this case **CLOSED**.

　　　　　　　　　　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　　　　　　　　　　s/ Terrence F. McVerry
　　　　　　　　　　　　　　　　　　　　Senior United States District Judge

**cc:**　**Michael V. Quatrini, Esq.**
　　　　Email: mvq@qrlegal.com

　　　　**Christy Wiegand, Esq.**
　　　　Email: christy.wiegand@usdoj.gov

　　　　**Michael Colville, Esq.**
　　　　Email: michael.colville@usdoj.gov

　　　　(via CM/ECF)